FILED

2020 Nov-23 PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| T.T., as guardian and next friend of<br>C.T., a minor, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-1965-GMB |
| | ) | |
| JEFFERSON COUNTY BOARD<br>OF EDUCATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

Before the court is Defendant Jefferson County Board of Education's motion for judgment on the administrative record. Doc. 19.  Plaintiff T.T. brought this action on behalf of her son, C.T., a student with an intellectual disability.  T.T. asserts that the defendant denied her son the free appropriate public education ("FAPE" or "appropriate education") guaranteed him by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*.  This action appeals the decision of a hearing officer who determined that the defendant did not deny C.T. an appropriate education during the spring and summer of 2019.  The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 14.  Both parties have asked this court to enter judgment in their favor on the basis of the record compiled during the administrative due process

hearing. Docs. 19 at 30 & 20 at 26.  For the reasons explained below, the court will enter judgment in favor of the defendant.

## I.  LEGAL BACKGROUND AND STANDARD OF REVIEW

The purpose of the IDEA is to ensure that all children with disabilities receive "a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).   The IDEA requires the states to identify, locate, and evaluate students in need of special education and related services. 20 U.S.C. § 1412(a)(3)(A).   The individualized education program ("IEP") is the chief tool used to deliver services to students with disabilities. *Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017).  An IEP is a "comprehensive plan prepared by a child's 'IEP Team' (which includes teachers, school officials, and the child's parents)." *Id.*  The detailed procedures governing IEP development "emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances." *Id.* (citing 20 U.S.C. § 1414).  Every IEP must describe the child's present levels of academic and functional performance, the effect of the disability on the child's performance, measurable annual goals (both academic and functional), how the child's progress toward those goals will be measured, and the special education and related services that will be provided to the child. 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(IV).

"To meet its substantive obligation under the IDEA, the school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999.  If a parent believes that a school has not provided an appropriate IEP, the parent can submit a complaint. 20 U.S.C. § 1415(b)(6).  The complaint then will be reviewed by a hearing officer in an impartial due process hearing. 20 U.S.C. § 1415(f)(1)(A).  "[A]ny party aggrieved by the findings and decision made" by the hearing officer "shall have the right to bring a civil action with respect to the complaint presented . . . in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A).

A district court reviews a hearing officer's factual findings for clear error and reviews questions of law *de novo*. *Draper v. Atlanta Ind. Sch. Sys.*, 518 F.3d 1275, 1284 (11th Cir. 2008).  "When weighing the evidence, the District Court gives 'due weight' to the ALJ decision, and 'must be careful not to substitute its judgment for that of the state educational authorities.'" *R.L. v. Miami-Dade County Sch. Bd.*, 757 F.3d 1173, 1178 (11th Cir. 2014) (quoting *Walker County Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000)).  And "when the District Court rejects the ALJ's conclusions, it is 'obliged to explain why.'" *Id.* at 1178 (quoting *Loren F. ex rel. Fisher v. Atlanta Ind. Sch. Sys.*, 349 F.3d 1309, 1314 n.5 (11th Cir. 2003)).  "Any review of an IEP must appreciate that the question is whether the IEP

3

is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. at 999.

"[T]he usual [Federal Rule of Civil Procedure] 56 summary judgment principles do not apply in an IDEA case." *Loren F.*, 349 F.3d at 1313.  Instead, a district court may "bas[e] its decision on the preponderance of the evidence" even when facts are in dispute. 20 U.S.C. § 1415(i)(2)(C)(iii); *see Loren F.*, 349 F.3d at 1313.  The party seeking relief bears the burden of demonstrating that the student was denied an appropriate education. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 58 (2005).  And district courts have broad discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii); *see Sch. Comm. of Burlington v. Dep't of Ed. of Mass.*, 471 U.S. 359, 369 (1985); *R.L.*, 757 F.3d at 1178.

## II.  FACTUAL BACKGROUND

T.T. is the parent and legal guardian of her son, C.T. Doc. 1-1 at 1.  On January 25, 2019, T.T. enrolled her son at McAdory High School ("McAdory"). Doc. 1-1 at 4.  Prior to his enrollment at McAdory, C.T. had been educated in a private school in Montgomery, Alabama from 2015 to 2018. Doc. 1-1 at 4.  C.T. and T.T. then moved to Jefferson County, where T.T. homeschooled her son for the first semester of the 2018–2019 academic year. Doc. 1-1 at 4–5.  T.T. contacted McAdory staff in January 2019 to discuss enrolling C.T. Doc. 1-1 at 5.  On January 23, Stacy Strozier,

a special education teacher at McAdory, spoke with T.T. by phone. Doc. 1-1 at 5. T.T. then provided Strozier various records regarding C.T.[1] Doc. 19 at 10.

An IEP team—consisting of McAdory faculty and staff, T.T., and C.T.—met on Friday, January 25 and developed an IEP (the "January IEP") for C.T. Docs. 1-1 at 5 & 18-7 at 16.  As part of the team's assessment, T.T. and one of C.T.'s former teachers completed an Adaptive Behavior Assessment System, Third Edition ("ABAS-3"). Docs. 18-3 at 37 & 18-10 at 43–52.  T.T. also completed a Gilliam Autism Rating Scale-Third Edition ("GARS-3"). Doc. 18-3 at 37 & 18-10 at 53. The IEP team determined that C.T. would be taught in a self-contained classroom by a special education teacher and that he would work toward a diploma based on the Alternate Achievement Standards Pathway. Doc. 18-7 at 6.  C.T. started classes at McAdory on the following Monday. Doc. 1-1 at 5.

On April 5, 2019, T.T. and C.T. met with the IEP team to review C.T.'s IEP and discuss the need for additional data collection. Doc. 18-9 at 102–03.  T.T. expressed concerns about C.T.'s fine motor skills and language difficulties and disclosed that C.T. had received occupational therapy and speech and language therapy at a prior public school, so the team decided to reevaluate C.T. for needs

---

[1] The records included a report by Susan White, Ph.D., summarizing the results of an autism study for C.T. in April 2018 (Doc. 18-6 at 31–32); a report of a neuropsychological evaluation performed by Mark Prohaska, Ph.D., in April 2018 (Doc. 18-6 at 38–45); and a report of a psychological evaluation performed by the office of Clark Psychological Associates in November 2017. Doc. 18-6 at 33–37.

relating to those two services. Docs. 18-7 at 24.  Lindsey Davis, an occupational therapist, performed the occupational therapy assessment on April 17, 2019. Doc. 18-9 at 107.  In her report on the evaluation, Davis indicated that the evaluation was performed because of parental concerns. Doc. 18-9 at 107.  The report concluded that C.T.'s performance on the visual and motor coordination subtests met or exceeded expectations based on his current functional level. Docs. 18-3 at 5 & 18-9 at 108.  C.T.'s language skills also were tested using the Oral and Written Language Scales, Second Edition ("OWLS-II"). Doc. 18-9 at 54–55.  Kelly Daspit, C.T.'s speech therapist in the fall of 2019, testified that C.T.'s OWLS-II score is consistent with his IQ and that C.T. is "very adept at communicating his wants and needs." Doc. 18-2 at 83–84.

On May 17, 2019, the IEP team reconvened to discuss the results of C.T.'s most recent assessments and revisions to his IEP. Doc. 18-7.  The discussion resulted in a revised IEP (the "May IEP") that provided for both speech and language therapy and occupational therapy. Doc. 18-7 at 48–49.

Later that month, T.T. filed a due process complaint under the IDEA. Doc. 18-5 at 207.  That complaint was dismissed. Doc. 18-5 at 157.  T.T. filed a new complaint in August 2019. Doc. 18-5 at 220–27.  The hearing officer dismissed T.T.'s claims for denial of enrollment and violation of the school board's child find duty. Doc. 18-5 at 29–30.  Three claims remained: whether C.T. was denied an

appropriate education (1) by the way the IEP team wrote C.T.'s goals and benchmarks; (2) by the lack of extended school year services; and (3) by the lack or delay of the related services of speech and language therapy, occupational therapy, behavioral therapy, and physical therapy. Doc. 18-5 at 30.  The hearing officer held a one-day evidentiary hearing in October 2019 to address these remaining issues. Docs. 18-2, 18-3 & 18-4.  On October 14, 2019, the hearing officer determined that C.T. had not been denied an appropriate education. Doc. 18-5 at 26.  On December 5, 2019, T.T. filed her complaint before this court appealing the hearing officer's decision. Doc. 1.

## III. DISCUSSION

T.T. brings four claims in this case against the Jefferson County Board of Education.  First, T.T. argues that the Board violated its statutory child find duty by not testing C.T. and finding him eligible for four related services (speech and language therapy, occupational therapy, behavioral therapy, and physical therapy) when developing the January IEP. Doc. 1 at 4–10.  This claim largely parallels T.T.'s claim that the defendant should have provided (or should have provided sooner) speech and language therapy, occupational therapy, behavioral therapy, and physical therapy. Doc. 1 at 15–17.  Therefore, the court will address these claims together. T.T.'s second claim is that the goals, objectives, and benchmarks in C.T.'s IEPs were written in a way that violates the IDEA. Doc. 1 at 10–13.  T.T.'s final claim is that

the school should have provided C.T. with extended school year services. Doc. 1 at 14–15.  The court addresses these three claims in turn.

## A.     Related Services

The IDEA requires schools to "conduct a full and individual initial evaluation." 20 U.S.C. § 1414(a)(1)(A).  The evaluation must assess all students in all areas of reasonably suspected disability. 20 U.S.C. § 1414(b)(3)(B); *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009).  A school's evaluation decision is reasonable "if the information that a school has concerning the student gives the school notice of an underlying disability." *Rosaria M. v. Madison City Bd. of Ed.*, 325 F.R.D. 429, 438 (N.D. Ala. 2018) (citing *Phyllene W. v. Huntsville City Bd. of Ed.*, 630 F. App'x 917, 924–25 (11th Cir. 2015)).  In this context, the relevant disabilities include "intellectual disabilities, . . . speech or language impairments, . . . autism, . . . or specific learning disabilities." 20 U.S.C. § 1401(3)(A)(i).

When assessing a student's disabilities, a school district must "[d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations." 34 C.F.R. § 300.306(c).  "A student is therefore unlikely to need special education if, *inter alia*: (1) the student meets academic standards; (2) teachers do not recommend special education for the student; (3) the student does not exhibit unusual or alarming conduct warranting

special education; and (4) the student demonstrates the capacity to comprehend course material." *Durbrow v. Cobb County Sch. Dist.*, 887 F.3d 1182, 1193–94 (11th Cir. 2018).

"But even if the failure to conduct [a particular assessment] is a procedural violation, a '[v]iolation of any of the procedures of the IDEA is not a *per se* violation of the Act.'" *Rosaria M.*, 325 F.R.D. at 438 (quoting *K.A. ex rel. F.A. v. Fulton County Sch. Dist.*, 741 F.3d 1195, 1205 (11th Cir. 2013)). And "[e]ven when a school board does not conduct [a particular assessment], the board nonetheless may provide the student with [an appropriate education] during the period governed by the IEP if the program that the IEP team designs adequately addresses the student's needs and prepares the student for further education." *Rosaria M.*, 325 F.R.D. at 438 (citing *M.W. ex rel. S.W. v. N.Y.C. Dep't of Ed.*, 725 F.3d 131, 141 (2d Cir. 2013)). In *Rosaria M.*, *id.* at 437–39, the school did not conduct a functional behavioral analysis, but the court found that student still received an appropriate education because the IEP adequately addressed the student's behavioral concerns. Ultimately, "the IDEA does not require the IEP to furnish every special service necessary to maximize each child's potential." *J.B. v. N.Y.C. Dep't of Ed.*, 242 F. Supp. 3d 186, 189 (E.D.N.Y. 2017) (citing *M.H. v. N.Y.C. Dep't of Ed.*, 685 F.3d 217, 224 (2d Cir. 2012)).

T.T. has not proved by a preponderance of the evidence that the IEP team

denied C.T. an appropriate education by failing to provide speech and language therapy in the January IEP. The independent evaluations provided by T.T. indicated that C.T. had "speech and communication abnormalities" (Doc. 18-6 at 31); "a moderate deficit in the areas of receptive, expressive and written communication skills" (Doc. 18-6 at 37); and "significant delays in language development, in part due to a narrow pallet, for which he started receiving speech therapy in 2005." Doc. 18-6 at 38. And T.T. told the IEP team that C.T. had speech and language goals in place since kindergarten. Doc. 18-3 at 17. This is enough information to have put the IEP team on notice that C.T. should have been assessed for a speech-related disability. The court finds that the team's failure to do so was a procedural violation of the IDEA.

However, this violation does not amount to the denial of an appropriate education under the IDEA. Susan Wirt, director of exceptional education for the Jefferson County School Board, testified that the team included an annual goal and benchmarks for "Functional Language/Communication" in the January IEP to address C.T.'s needs in that area. Docs. 18-3 at 45 & 18-7 at 11. And Daspit, the speech therapist, testified that a special education teacher can implement language goals in the classroom as effectively as a therapist. Doc. 18-2 at 89. Patricia Latham, C.T.'s special education teacher, testified that C.T. communicates "very well" in her classroom. Doc. 18-2 at 37. In contrast, T.T. has not pointed to evidence in the

record showing that C.T.'s education suffered without speech and language therapy during the spring of 2019.

Regarding occupational therapy, one of the independent reports provided by T.T. indicated that C.T. has "significant delays in motor development," noting that he could not tie his own shoes or button or zip his own clothes. Doc. 18-6 at 38.  T.T. also told the IEP team that C.T. had goals related to occupational therapy in place since kindergarten. Doc. 18-3 at 17.  This is enough information to have put the team on notice that C.T. should have been assessed for occupational therapy.  However, as with speech and language therapy, the team's failure to do so did not deny C.T. an appropriate education.  T.T. has not produced any evidence that C.T.'s education suffered for his lack of occupational therapy in the spring of 2019.  In fact, when the school later assessed C.T. for occupational therapy, the therapist concluded that C.T.'s visual motor integration was on track and that he was actually overachieving in motor coordination and visual perception relative to his overall functional ability. Docs. 18-3 at 5 & 18-9 at 108.  And the evidence indicates that the May IEP included occupational therapy in response to T.T.'s request rather than any observed need. Docs. 18-2 at 37 & 18-7 at 24.

Regarding behavioral therapy, T.T. expresses a concern that the school did not complete a functional behavior assessment or develop a behavioral intervention plan. Doc. 1 at 8.  In support, T.T. provided independent reports of evaluations that

occurred within the two years before C.T.'s enrollment at McAdory indicating that he was "restless and stomped his foot repetitively . . . yelled, made odd sounds, growled, and hissed [and] also rocked back and forth" (Doc. 18-6 at 33); that he had engaged in head-banging behavior since a young age but that this behavior was becoming less frequent (Doc. 18-6 at 34); and that he had discipline problems at school consisting of being "non-compliant, tearing up work, throwing things, cursing, and pinching himself." Doc. 18-6 at 35.  T.T. also testified that she raised concerns about C.T.'s behavior during the January IEP meeting. Doc. 18-3 at 17. This information is enough to have put the IEP team on notice that C.T. potentially had a behavior-related disability.  The team's failure to assess C.T. regarding his behavior is a procedural violation of the IDEA.

However, Latham testified that C.T. exhibited no behavioral concerns in her classroom. Doc. 18-2 at 12.  Counsel for T.T. asked Latham about some of C.T.'s potentially problematic behaviors, but she was able to explain how each of those behaviors did not disrupt her classroom or teaching. Doc. 18-2 at 12–14.  T.T. thus has pointed to no evidence that C.T.'s behavior disrupted his education.  Therefore, the school's procedural violation of the IDEA did not deny C.T. an appropriate education.

Finally, there is almost no evidence suggesting that C.T. had any need for physical therapy.  T.T. did testify that she told the IEP team in January that C.T. had

goals related to physical therapy since kindergarten. Doc. 18-3 at 17.  However, there is no evidence that she or any of the independent reports indicated any current need for physical therapy.  Therefore, the school's failure to test for or provide physical therapy did not violate the IDEA.

For these reasons, this court affirms the hearing officer's decision that the school did not deny C.T. an appropriate education by not providing (or not providing sooner) any of these related services.

## B.   Goals, Objectives, and Benchmarks

T.T. articulates six objections to the goals, objectives, and benchmarks incorporated into the January and May IEPs. Doc. 1 at 10–13.  For the reasons below, none of the objections establishes a procedural violation of the IDEA or a substantive denial of an appropriate education to C.T.

### 1.   *Goals Copied from the Alternate Achievement Standards*

T.T. first argues that the goals in the IEPs were not individualized to C.T.'s needs because they were copied verbatim from the Alternate Achievement Standards. Doc. 1 at 11.  But, as Wirt explained, the team copied the goals because state regulations allow for copying goals into an IEP as long as they are individualized in terms of success or accuracy rate. Doc. 18-3 at 40.  To individualize C.T.'s goals and benchmarks, the team set success and accuracy rates that were specific to his needs and abilities. Docs. 18-3 at 40 & 18-7 at 11–13 & 43–47.  T.T.

has not indicated how the benchmarks and goals could or should have been further individualized or how the benchmarks and goals in any way denied C.T. an appropriate education.

### 2.    *Benchmarks*

T.T. asserts that some goals did not include benchmarks or the benchmarks were set too far apart. Doc. 1 at 11.  All of the subject areas included benchmarks. Doc. 18-7 at 11–13 & 42–47.  One of the subject areas in the January IEP had its first benchmark set for October 2019. Doc. 1 at 11–12.  The other subject areas had their first benchmark set for May 2019. Doc. 18-7 at 12–13.  While setting a benchmark for less than a ten-month interval may have been preferable, T.T. has not shown by a preponderance of the evidence that the October 2019 benchmark amounts to a procedural violation of the IDEA.  The IDEA regulations do not specify how far apart the benchmarks must be dated. *See* 34 C.F.R. § 300.320(a)(2)(ii). Even if one of the benchmarks could be have been set differently, "imperfect calibration of an intermediate step does not make [the] annual goal deficient." *Rosaria M.*, 325 F.R.D. at 449.  T.T. has not pointed to evidence showing that the dating of the benchmarks denied C.T. an appropriate education in any way.

### 3.    *No Baseline*

T.T. next argues that C.T. was denied an appropriate education because the IEPs lacked baseline data against which the goals and benchmarks could be

compared. Doc. 1 at 12.   However, "[t]he IDEA does not explicitly mandate [baseline] data." *Lathrop R-II Sch. Dist. v. Gray*, 611 F.3d 419, 424 (8th Cir. 2010). The IDEA requires only "a statement of the child's present levels of academic achievement and functional performance" and "a statement of measurable annual goals, including academic and functional goals." 20 U.S.C. § 1414(d)(1)(A)(i)(I) & (II); 34 C.F.R. § 300.320(a)(2)(ii).   C.T.'s IEPs contain all of the required information. *See* Doc. 18-7 at 11–13 & 40–47.   T.T. has not pointed to any evidence showing that a lack of specific baseline data has denied C.T. an appropriate education.

### 4.    *Reading Comprehension Goal*

Next, T.T. points out that the reading comprehension goal incorporated into the January IEP would be better framed as a listening comprehension goal. Doc. 1 at 12–13.   However, "an IEP does not need to identify annual goals for every deficit in order to provide a FAPE." *J.B.*, 242 F. Supp. 3d at 199.   T.T. has not pointed to any evidence indicating that C.T. has not received an appropriate education because of the reading comprehension goal.

### 5.    *Math Goal*

T.T. argues that the annual math goal and benchmarks in the May IEP contradict the description of C.T.'s present level of achievement. Doc. 1 at 13. However, rather than contradict the present level of achievement, the annual goal

and benchmarks build on it by describing more complex skills.  For example, the description of C.T.'s present level of achievement says he "can *interpret* data from a graph or chart." Doc. 18-7 at 43 (emphasis added).  The annual goal states that he will "*construct* a simple graph . . . and interpret the data *in terms of range, mode, and median, mean*." Doc. 18-7 at 43 (emphasis added).  The goal and benchmarks simply describe higher levels of skill than C.T.'s present level of achievement.  The math goals and benchmarks did not violate the IDEA or deny C.T. an appropriate education.

### 6.    *Social Studies Goal*

Finally, T.T. argues that the social studies goal in C.T.'s May IEP is "neither helpful nor relevant to his current level of performance." Doc. 1 at 13.  The social studies goal states that C.T. will be able to "identify 10 major events in Alabama from 1781 to 1823, including settlement, statehood, and conflicts with American Indians on 4 of 5 attempts with 80% accuracy." Doc. 18-7 at 47.  T.T. argues that it is inconceivable that C.T. could meet this goal when he can only answer one out of eight basic "wh" comprehension questions and can only recognize 37% of Dolch sight words. Doc. 1 at 13.  This argument requires factual assumptions that are not supported by the record, and T.T. has provided no other evidence that this goal is inappropriate for C.T.  In fact, C.T.'s teacher testified that she chose the goal by looking at data from the classroom to determine a suitable goal after T.T. requested

that she do so. Doc. 18-2 at 51–52.  This court will follow the Eleventh Circuit's guidance not to "substitute its own judgment for that of the state educational authorities." *R.L.*, 757 F.3d at 1178 (quoting *Bennett*, 203 F.3d at 1297).  T.T. has not provided sufficient evidence that this goal denied C.T. an appropriate education.

## C.    Extended School Year Services

T.T.'s final objection to the IEPs is that they did not provide for extended school year ("ESY") services. Doc. 1 at 14.  Specifically, T.T. argues that the IEP team failed to use retrospective and predictive data to determine C.T.'s rate of regression and recoupment in making its decision not to offer ESY to C.T. Doc. 1 at 14.  The IDEA regulations require an IEP team to determine whether ESY is necessary to provide an appropriate education to a student. *See* 34 C.F.R. § 300.106(a)(2).  In *Todd v. Duneland School Corporation*, 299 F.3d 899, 906–07 (7th Cir. 2002), the plaintiff contended that the IEP team violated the IDEA by not providing ESY for her ninth-grade child.  However, the court determined that the IEP team had not violated the IDEA when the team considered but rejected ESY because the student had not shown regression during school vacations or an inability to progress toward his goals. *Id.* at 907.

Both of C.T.'s IEPs indicate that the team considered the need for ESY. Doc. 18-7 at 20 & 50.  Latham testified that the IEP team discussed ESY and decided against it based on her observations of C.T. throughout the year, particularly after he

returned from spring break. Doc. 18-2 at 39.  She also testified that T.T. seemed pleased with the May IEP and did not comment on the lack of ESY during the May IEP meeting. Doc. 18-2 at 51–52.  T.T. only asked for some of C.T.'s reading materials so that she could provide them to his reading tutor for that summer. Doc. 18-2 at 52.  For her part, T.T. testified that upon her arrival at the May IEP meeting the team told her that they had discussed ESY but decided C.T. would not regress enough to require it. Doc. 18-3 at 21.  Wirt testified that observation and work sample are the best means of determining whether to provide ESY for children whose IQs fall below the mean. Doc. 18-3 at 46.

Neither the federal nor the Alabama regulations relating to ESY require a specific type of data on which the IEP team must base its decision.  This court can find no reason why the observations of C.T.'s teacher serve as an inadequate or improper basis for an ESY decision.  Therefore, T.T. has not shown that the IEP team's decision not to provide ESY denied C.T. an appropriate education.

## IV.  CONCLUSION

For the foregoing reasons, it is ORDERED that the defendant's motion for judgment on the administrative record (Doc. 19) is GRANTED and that all claims in this action are DISMISSED with prejudice.

A final judgment will be entered separately.

DONE and ORDERED on November 23, 2020.

_____

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE